## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **BRIDGEPORT HOLDINGS INC., <u>et al.</u>,** | **Case No. 03-12825 (PJW)**<br>**Jointly Administered** |
| **Debtors.** | |
| **BRIDGEPORT HOLDINGS INC. LIQUIDATING TRUST,** | |
| **Plaintiff** | |
| **v.** | **Adv. Proc. No. _____ (__)** |
| **ALFRED D. BOYER, BRADFORD M. FREEMAN, WILLIAM JOHNSON, LAURENCE MIDLER, CHARLES P. RULLMAN, KASHIF F. SHEIK, GARY L. WILSON, JEROME B. YORK and LAWRENCE RAMAEKERS,** | **REDACTED PUBLIC VERSION** |
| **Defendants.** | |

## <u>COMPLAINT</u>

Bridgeport Holdings Inc. Liquidating Trust (the "Liquidating Trust"), by and through its undersigned counsel, as successor to Bridgeport Holdings Inc. ("Bridgeport Holdings") and its affiliated debtors, Micro Warehouse, Inc., Micro Warehouse, Inc. of Ohio, Micro Warehouse Gov/Ed, Inc., and Micro Warehouse International, Inc. (collectively, "Micro Warehouse") (Bridgeport Holdings and Micro Warehouse are also sometimes referred to collectively as the "Company" or "Debtors"), as and for its complaint against Alfred D. Boyer, Bradford M. Freeman, William Johnson, Laurence Midler, Charles P. Rullman, Kashif F. Sheik, Gary L. Wilson, Jerome B. York (collectively, the "D&O Defendants") and Lawrence Ramaekers, respectfully alleges as follows:

**INTRODUCTION**

1.     The Liquidating Trust brings this action as a result of the Company's fraudulent conveyance of its North American operations (the "Transferred Assets") to CDW Corporation, CDW SAC, Inc. and CDW Canada Inc. (collectively "CDW") on or about September 9, 2003, immediately before the filing of the Chapter 11 petition by the Debtors on or about September 10, 2003.   As detailed herein, certain of the D&O Defendants, in their capacities as *directors*, breached their fiduciary duties to the Company, its shareholders and its creditors and failed to act in good faith; certain of the D&O defendants, in their capacities as *officers*, also breached their duty of care to the Company, its shareholders and its creditors. (As detailed below, certain D&O Defendants served as both directors and officers; others served only as directors; and D&O Defendant Midler served only as an officer, not a director, for all but a few days of the time described in this complaint.)   These acts and omissions culminated in the rushed "fire sale" of the Transferred Assets on September 9, 2003.   The approval and closing of this transaction constituted further breaches of the duty of loyalty and the duty of care by Defendants, resulting in the Company, its shareholders and its creditors suffering damage.

2.     Furthermore, the fraudulent conveyance was done under the direction and supervision of Defendant Ramaekers, who, on information and belief, served as an officer of the Company beginning on or about August 19, 2003, and continued to serve as an officer through and including the closing of the fraudulent conveyance transaction and the filing of the bankruptcy petitions.

**THE PARTIES**

3.     The Liquidating Trust was established as a newly organized successor of the Debtors by the Liquidating Trust Agreement (the "Agreement") by and among the Debtors

and Keith Cooper (the "Liquidating Trustee") dated October 14, 2004, pursuant to, and to effectuate, the Official Committee of Unsecured Creditors' First Amended Plan of Distribution for Bridgeport Holdings Inc. and Its Debtor Affiliates (the "Plan"), filed on July 27, 2004 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The beneficiaries of the Liquidating Trust are creditors of the Company in Classes 3, 4 and 5 of the Plan. The Liquidating Trust is a Delaware trust doing business c/o FTI Consulting, Attention: Keith Cooper, 1201 West Peachtree Street, Suite 500, Atlanta, Georgia 30309.

4.    This action is brought pursuant to the Plan and the Agreement made and delivered in connection with the Plan, which Plan preserves all of the Debtors' rights in respect of these causes of action; transfers the Debtors' rights in respect of these causes of action to the Liquidating Trust; and empowers the Liquidating Trustee, on behalf of the Liquidating Trust, to investigate, prosecute, collect, and/or settle such causes of action as deemed appropriate.

5.    Upon information and belief, Defendant Alfred D. Boyer was a Director and Officer of the Company at the time of the facts complained of herein, until his resignation as Director and Officer on or about September 5, 2003. Mr. Boyer resides at 542 The Strand, Hermosa Beach, California 90254.

6.    Upon information and belief, Defendant Bradford M. Freeman was a Director of the Company at the time of the facts complained of herein, until his resignation as Director on or about September 5, 2003. Mr. Freeman is a principal of Freeman Spogli & Co., and his address is c/o Freeman Spogli & Co., 11100 Santa Monica Boulevard, Suite 1900, Los Angeles, California 90025.

7.    Upon information and belief, Defendant William Johnson was a Director of the Company at the time of the facts complained of herein, until his resignation as Director on

3

or about September 5, 2003. Mr. Johnson's address is c/o Freeman Spogli & Co., 11100 Santa Monica Boulevard, Suite 1900, Los Angeles, California 90025.

8.     Upon information and belief, Defendant Laurence Midler was an Officer of Micro Warehouse, Inc., a wholly-owned subsidiary of Bridgeport Holdings Inc., at the time of the facts complained of herein, including the date of the filing of the Chapter 11 petition by the Debtors on or about September 10, 2003. Upon information and belief, Mr. Midler also served as a Director of Bridgeport Holdings Inc. from on or about September 6, 2003 through and including the filing of the chapter 11 petition by the Debtors on or about September 10, 2003. Mr. Midler's address is c/o CB Richard Ellis, Inc., 100 North Sepulveda Blvd., El Segundo, CA 90245.

9.     Upon information and belief, Defendant Charles P. Rullman was a Director and Officer of the Company at the time of the facts complained of herein, until his resignation as Director and Officer on or about September 5, 2003. Mr. Rullman's address is c/o Freeman Spogli & Co., 11100 Santa Monica Boulevard, Suite 1900, Los Angeles, California 90025.

10.     Upon information and belief, Defendant Kashif F. Sheik was a Director of the Company at the time of the facts complained of herein, until his resignation as Director on or about September 5, 2003. Mr. Sheik's address is c/o Oakmont Corporation, 865 S. Figueroa St., Suite 700, Los Angeles, California 90017.

11.     Upon information and belief, Defendant Gary L. Wilson was a Director and Officer of the Company at the time of the facts complained of herein, until his resignation as Director and Officer on or about September 5, 2003. Mr. Wilson resides at 300 Delfern Drive, Los Angeles, California 90077.

12.     Upon information and belief, Defendant Jerome B. York was a Director and Officer of the Company at the time of the facts complained of herein, until his resignation as Director and Officer on or about September 7, 2003.  Mr. York resides at 3700 Tremonte Circle South, Rochester, Michigan 48306.

13.     Upon information and belief, Defendant Lawrence Ramaekers became an Officer of Bridgeport Holdings Inc. and an Officer of Micro Warehouse, Inc. on or about August 19, 2003, and served as such at the time of the consummation of the sale of the Transferred Assets to CDW immediately before the filing of the Chapter 11 petition by the Debtors on or about September 10, 2003.  Mr. Ramaekers resides at 6027 Le Lac Road, Boca Raton, Florida, 33496.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1331 and 1334 because this is a civil proceeding arising under the Bankruptcy Code, or arising in or related to the Debtors' estates.

15.     This is a core proceeding within the meaning of 28 U.S.C. § 157.

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1409(a) because this is the district where the Debtors' Chapter 11 case is pending.

## FACTUAL ALLEGATIONS

### Background Regarding Micro Warehouse's Financial Distress

17.     In or about January 2000, at the height of the dot-com boom, Micro Warehouse was acquired by a group of investors in a leveraged buyout ("LBO").  In the LBO, Micro Warehouse became indebted to a syndicate of eighteen (18) financial institutions (the

"Secured Lenders") led by CS First Boston ("CSFB") as agent, pursuant to a Credit Agreement dated as of January 31, 2000 (the "Credit Agreement").

18.     Approximately one year after the LBO, the technology sector suffered a significant downturn due to the bursting of the dot-com bubble and the lull in technology spending following "Y2K" upgrades.  There was a further decrease in consumer demand following the terrorist attacks of Sept. 11, 2001.

19.     This recession resulted in an erosion in Micro Warehouse's sales.  The recession, coupled with Micro Warehouse's debt load, resulted in a degradation of Micro Warehouse's financial outlook.

20.     As a result, Micro Warehouse was forced to negotiate amendments to the Credit Agreement at the end of 2000, leading to the execution of an Amended and Restated Credit Agreement dated December 15, 2000 (the "Amended Credit Agreement").

21.     Micro Warehouse's financial problems continued, and in early 2002 Micro Warehouse had defaulted on one or more of its loan covenants.  The Company was again forced to renegotiate its credit facility with the Secured Lenders, leading to the execution of Amendment No. 1, Waiver and Agreement to the Amended Credit Agreement, dated January 11, 2002.

**The D&O Defendants Consciously Ignore Micro Warehouse's Financial Condition**

22.     Following the amendment of Micro Warehouse's loan agreements, the D&O Defendants were faced with various options that would have improved the financial performance of the Company, including (i) a new private equity investment in the company; (ii) a business combination with a competitor; and (iii) a debt restructuring with an asset-based lender.

23.     Nevertheless, the D&O Defendants failed to follow through with any of these recognized options to improve the Company's financial condition, and Micro Warehouse's financial decline continued throughout 2002.

24.     A presentation from an October 29, 2002 Shareholder Meeting reveals that by that date, the D&O Directors had identified the following "M&A Alternatives": (i) "Potential Merger," (ii) "Potential Joint Ventures" and (iii) "Potential Asset Sales."

25.     At that time, however, the D&O Defendants failed to engage the Company in any of these alternatives identified to improve the Company's financial condition.

26.     By the fall of 2002, Micro Warehouse was suffering from liquidity difficulties, and the D&O Defendants knew that the Company would default on its EBITDA covenant at the coming year end.  Around the same time, key vendors began to restrict Micro Warehouse's lines of credit.

27.     During litigation of the Liquidating Trust's fraudulent conveyance action against CDW, Stephen Yankauer of CSFB gave testimony that in October 2002, concerns about the Company's liquidity were "severe and significant" and the Secured Lenders were concerned about the possibility of a "free fall" bankruptcy.  Yankauer further testified he considered the loan to be "upside down," meaning that the Company owed more on the loan than the security was worth, from both a going-concern and liquidation perspective.  Yankauer described Micro Warehouse's suppliers as "watching [the Company] like a hawk."

28.     Canadian Imperial Bank of Commerce ("CIBC"), another of the Secured Lenders, classified Micro Warehouse as having a "very weak financial condition" and its loan as "non-performing."  CIBC was "very skeptical" of the Company's ability to survive at that time.

29.    Between December 2002 and March 2003, Micro Warehouse remained in breach of its EBITDA loan covenant, and had also failed to make the required principal payments on its term loans. Accordingly, the D&O Directors were ultimately forced to obtain four separate, short-term covenant waivers from the Secured Lenders through the fourth quarter of 2002 and the first quarter of 2003.

30.    Meanwhile, Micro Warehouse and the Secured Lenders negotiated a restructuring of the secured debt facility, which closed on April 11, 2003.

31.    Despite the restructuring of its debt, however, Micro Warehouse's downward spiral continued through the spring and mid-summer of 2003, as its key vendors further restricted its lines of credit.

32.    In early June 2003 the Secured Lenders urged Micro Warehouse to hire a restructuring advisor. For approximately two months, however, the D&O Defendants ignored their responsibilities to the Company and its shareholders to act in their best interest, and failed to do so. Meanwhile, Micro Warehouse's financial condition worsened.

33.    By July 2003, it was very difficult for Micro Warehouse to obtain product to timely fill customer orders, and key salespeople began leaving the Company to join competitors.

34.    As they watched key salespeople flee to competitors, the D&O Defendants continued to sit on their hands and disregard their responsibilities to act in the best interest of the Company and its shareholders. Among other things, in the face of the Company's dire financial condition, the D&O Defendants failed to contact Micro Warehouse's competitors who had previously expressed interest in a transaction with Micro Warehouse, to discuss whether they would be interested in purchasing Micro Warehouse's North American business.

35.    On or about July 18, 2003, the Company met with its Secured Lenders to discuss Micro Warehouse's financial condition. During this meeting, the D&O Defendants again disregarded the financial "red flags" and painted an unjustifiably rosy picture of Micro Warehouse's future.

36.    As late as July 25, 2003, the Company told its Secured Lenders that it expected Micro Warehouse to have "strong profitability and cash flow in the second half of [2003]."

37.    Minutes from an August 5, 2003 meeting of Micro Warehouse's board of directors show that, by that date, one of Micro Warehouse's largest vendors had reduced Micro Warehouse's credit line by an aggregate $11 million, and that Micro Warehouse was engaging in a process of holding back checks to vendors due to insufficient cash. As of that date, at least four trade creditors completely cut off Micro Warehouse's credit line.

38.    At the Secured Lenders' repeated urgings, the D&O Defendants finally approved the retention of Alix Partners as restructuring advisor to the Company, on or about August 5, 2003.

39.    An August 8, 2003 draft presentation prepared by Micro Warehouse discussed the Company's "strategic options" and concluded that its "best option for moving forward" was "to execute upon a 'sell' strategy." Still, the D&O Defendants failed to commence a competitive bidding process at that time.

40.    Instead, Defendant Wilson called only upon his "long time acquaintance" John Edwardson, the CEO of CDW, and requested that Edwardson talk to Defendant York "seriously and quickly about [Micro Warehouse]." Edwardson agreed and a few days later, on August 11, 2003, Defendants Wilson and York met with Edwardson in Los Angeles to explore

the possibility of a transaction with CDW. As of that date, the D&O Defendants had not contacted any company other than CDW to seriously discuss a possible transaction.

**The D&O Defendants Abdicate Crucial Authority to Defendant Ramaekers**

41.     Although the financial condition of the Company continued to worsen on a daily basis, the D&O Directors let nearly two weeks pass from the date they approved the concept of retaining Alix Partners to the date they actually did so. On or about August 18, 2003, the D&O Directors retained Alix Partners, through its affiliate AP Services, LLC, to furnish the Company with restructuring professionals. Among these professionals was Defendant Ramaekers, who was hired as the Company's Chief Operating Officer.

42.     On or about August 19, 2003, Ramaekers was elected or appointed by the Company's Board of Directors to the position of Chief Operating Officer.

43.     In an email from Jerry York, Micro Warehouse's CEO, to all of the Company's North American employees, York wrote: "Effective immediately, Larry [Ramaekers] has been elected Chief Operating Officer of Micro Warehouse by the Board of Directors."

44.     In an affidavit dated September 11, 2003 and filed with this Court, Ramaekers swore, under penalty of perjury, that "Effective August 19, 2003, I was appointed to the positions of Vice President and Chief Operating Officer of Bridgeport Holdings, Inc, and the Debtor subsidiaries . . . ."

45.     On or about August 19, 2003, Defendant Ramaekers commenced work at Micro Warehouse.

46.     At or about this time, the D&O Defendants abdicated crucial decision-making authority to Defendant Ramaekers.

47.    From this point until their resignation, the D&O Defendants failed to supervise Defendant Ramaekers adequately, in breach of their fiduciary duties.

48.    By Friday, August 22, within 72 hours of commencing work at Micro Warehouse, Defendant Ramaekers had determined to sell the Transferred Assets.

**Defendant Ramaekers Conducts a Flawed Sales Process**

49.    Instead of commencing a competitive bidding process for Micro Warehouse's North American businesses, however, Defendant Ramaekers immediately seized upon the CDW opportunity identified a few days before.

50.    On or about the same day that Defendant Ramaekers arrived at Micro Warehouse, CDW sent a written list of requests for documents to begin its due diligence. Micro Warehouse then began the process of assembling a data room at its headquarters in Norwalk, Connecticut.

51.    Defendant Ramaekers did not hire investment bankers to "shop" the deal; he did not conduct a thorough search for potential strategic buyers; and he did not even consider contacting potential financial buyers. Instead, Ramaekers seized on the fact that Defendants York and Wilson had already had a meeting with CDW, and he quickly settled on CDW as the favored acquirer.

52.    On or about August 27, 2007, five days after Ramaekers recommended an asset sale, CDW arrived in Connecticut to begin its on-site due diligence. At the close of the following day, CDW made its first offer.

53.    Over the course of the Labor Day weekend, August 30 – September 1, 2003, CDW and Micro Warehouse negotiated only small changes in the terms of the offer,

resulting in a "handshake deal" on September 2 with business terms only somewhat improved over CDW's initial offer.

54.     In the week and a half between Ramaekers recommending a sale of Micro Warehouse's assets and the "handshake deal" between Micro Warehouse and CDW, neither Ramaekers nor the D&O Defendants made a serious effort to contact other potential purchasers.

55.     Ramaekers made contact with one other potential acquirer, PC Connection, but provided PC Connection with only limited due diligence materials. PC Connection's CEO, Patricia Gallup, testified that her company was provided access to the due diligence materials over the Labor Day weekend, and was not given adequate time to perform its due diligence.

56.     PC Connection's efforts to obtain due diligence on the Company were further stymied on September 2, 2003 — the day after Labor Day — when Micro Warehouse entered into an agreement to negotiate exclusively with CDW until September 9, 2003. When PC Connection contacted Micro Warehouse on September 3, 2003, and sought to obtain due diligence, PC Connection was told that Micro Warehouse could not provide the requested information due to the exclusivity provision.

57.     Gallup testified that Micro Warehouse never permitted PC Connection to submit its best and final offer.

58.     As for other bidders, Micro Warehouse, through Ramaekers, made only cursory calls to Dell and Apple to see if either was interested in a transaction. The D&O Defendants and Ramaekers failed to seriously consider Dell as a potential purchaser, notwithstanding Micro Warehouse's previous observation that it should "pitch[]" the Company's strengths "to buyers who meet the selection criteria (e.g. Dell)."

59.     Other competitors of Micro Warehouse were not contacted at all to see if they were interested in bidding on Micro Warehouse's assets.  The most significant of these was Office Depot, a large, publicly-traded company that was interested in acquisitions in the industry. That the D&O Defendants, through Defendant Ramaekers, failed to conduct an adequate sales process is illustrated by a letter that counsel for Office Depot wrote on September 15, 2003, when the deal with CDW had already closed.  Office Depot complained that it was not informed of any opportunity to bid on the Company's domestic and Canadian assets, and that it would have been interested:

> We believe that investment bankers in the industry are aware that Office Depot has been actively exploring strategic opportunities with catalogue and online retailers and direct marketers such as the Debtors.  Thus, Office Depot was surprised to learn through the press, early last week, of the sale of the Debtors' domestic and Canadian operations to CDW SAC, Inc., and that it did not have an opportunity to bid on these assets before the sale.  Having read Lawrence Ramaekers' first-day declaration and his summary of the circumstances facing the Debtors immediately before their bankruptcy filing, the Debtors should understand that Office Depot would have had a serious interest in such a transaction, and has the resources to pursue a transaction within the timeframe apparently dictated by the exigencies.

Exhibit A (emphasis added).

60.     The failure of Ramaekers and the D&O Defendants to contact Office Depot is even more incredible considering Office Depot had previously expressed an interest in potential acquisitions.

61.     When asked whether any of the members of Micro Warehouse's Board or management identified Office Depot as a potential strategic buyer, Ramaekers testified "I don't think so . . . They were not on my list."

62.     Illustrating another lost opportunity, Tim Crown, CEO of Insight Enterprises — a Micro Warehouse competitor — testified that he was never informed that the United States business was for sale.  Crown gave testimony that in late August 2003 he received a voicemail from Defendant Rullman, but before Crown even had a chance to return Rullman's phone call, Crown learned that Micro Warehouse had reached an agreement to sell the Company's U.S. and Canadian assets to CDW.  Crown testified that he didn't realize until it was too late that "Micro Warehouse was going to the auction block, so to speak."

63.     Defendant Ramaekers also failed to inform PC Mall — another Micro Warehouse competitor that had previously shown a strong interest in a transaction with Micro Warehouse — that Micro Warehouse's United States business was for sale.  Frank Khulusi, CEO of PC Mall, testified that his "agenda was to buy Micro Warehouse's domestic business," however, the first he heard that Micro Warehouse was interested in selling its U.S. business was when the Company issued a press release announcing that a deal had been reached with CDW.

64.     Ramaekers and the D&O Defendants also did not make any effort to contact potential financial buyers.  York testified that he didn't "recall" MW approaching any financial buyers before entering into the transaction with CDW, at least in part because he assumed that "financial buyers pay substantially less for assets than strategic buyers do."  Ramaekers testified that he assumed that potential financial buyers would not be interested in MW without "a book," and that he preferred a "quick sale."

**All of Defendants' Failures to Act in the Company's Best Interests Culminate in the Rushed Sale to CDW on the Eve of Bankruptcy**

65.     All of Defendants' failures to either sell or restructure the Company earlier, and their abdication of responsibility to Defendant Ramaekers, finally culminated in the

uninformed and hurried sale of a substantial portion of the Company's North American assets to CDW for a grossly low price (the "CDW Transaction") on September 9, 2003.

66.     In breach of their fiduciary duties of loyalty, care and good faith, the D&O Defendants acted on an uninformed basis, and failed to act in good faith, by approving the "fire sale" of the Transferred Assets to CDW on September 4, 2003.

67.     Defendants Boyer, Freeman, Johnson, Rullman, Sheik, Wilson and York then resigned.

68.     The Company announced on September 8, 2003 that an agreement had been reached to sell the Company's North American assets to CDW.  Pursuant to two Asset Purchase Agreements dated as of September 9, 2003 (one for the United States business and one for the Canadian business) (collectively, the "APA"), CDW paid the Company $20 million for its U.S. assets and $2 million for its Canadian assets.  The assets included the majority of the Debtors' inventory and substantially all of their intellectual property, information technology hardware assets and furniture and equipment located at certain of the Debtors' office locations. Additionally, the Debtors obtained a six-month put option to assign the lease and sell the assets of their Ohio distribution facility to CDW for $8 million, subject to certain conditions as described in the APA.

69.     The outcome of the "fire sale" conducted by Ramaekers, and approved by the D&O Defendants, was that Debtors' U.S. core business — which produced approximately $900 million of revenue annually — was conveyed to CDW for approximately $28 million, a small fraction of its value, to the detriment of the Company, its shareholders and its creditors.

70.     Defendants Midler and Ramaekers oversaw the consummation of this transfer for less than reasonably equivalent value to CDW on the eve of the bankruptcy filing.

71.    On September 10, 2003 (the "Commencement Date"), the Debtors then filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On September 24, 2004 (the "Confirmation Date"), the Bankruptcy Court entered an order confirming the Plan. The effective date of the Plan was October 14, 2004.

**Defendants' Acts and Omissions Constitute Breaches of Their Fiduciary Duties to Micro Warehouse, its Shareholders, and its Creditors**

72.    The D&O Defendants were directors and, in some cases, officers of the Company during Micro Warehouse's financial decline, up through and including the negotiation process with CDW. By virtue of their positions, a fiduciary relationship existed between the D&O Defendants and the Company and its shareholders.

73.    Additionally, as Micro Warehouse approached the zone of insolvency, this fiduciary relationship extended to the Company's creditors.

74.    As fiduciaries, the D&O Defendants were obligated to act at all times with reasonable care, in a manner consistent with the best interests of the Company, its shareholders, and its creditors, and with the highest degree of good faith.

75.    The D&O Defendants ignored numerous financial red flags culminating in the rushed fire sale to CDW.

76.    The D&O Defendants also acquiesced in Defendant Ramaekers' decision to sell the Transferred Assets in a hurried manner outside the supervision of the Bankruptcy Court. They allowed Defendant Ramaekers to market the Transferred Assets in a rushed and ineffective manner, and to negotiate terms of a sale, and then to consummate the sale of the Transferred Assets, in a highly compressed period surrounding the Labor Day holiday weekend. This expedited sale process was massively deficient and resulted in the Company's receiving

grossly inadequate consideration for the Transferred Assets, to the detriment of the Company, its shareholders and its creditors.

**The Culmination of Defendants' Acts and Omissions in the CDW Transaction Damaged the Company, its Shareholders and its Creditors**

77.     The conclusion that the flawed sale process and the CDW Transaction were not in the best interests of the Corporation, its shareholders, or its creditors is supported by testimony from industry participants.

78.     Monica Luechtefeld, an executive vice president at Office Depot, testified that her company was "surprised at the price" that CDW paid for Micro Warehouse's North American assets. She testified that Office Depot valued Micro Warehouse's North American assets at many times the $22 million CDW paid. She also testified that Office Depot had an "interest in Micro Warehouse," and was "surprised" that her company had not been contacted as a potential purchaser.

79.     Frank Khulusi, CEO of PC Mall, testified that he believed that the price that CDW paid for the Transferred Assets "was a very small amount, a very de minimus amount." Khulusi further stated in testimony that he felt his company, PC Mall, had "missed out on an opportunity" and that it would have been willing to pay more for the assets than CDW did, had he known they were for sale. Khulusi further testified that PC Mall was "ready, willing and able" to make an offer that did not require a sale pursuant to Section 363 of the Bankruptcy Code and that "topped" CDW's offer. Upon learning how much CDW paid for the Transferred Assets, Khulusi "immediately did the math in my head, and the impression that I ended up with was it was close to zero."

80.     PC Connection responded to the announcement of the deal – and the immediate spike in CDW's stock – by writing three more offer letters, one to Ramaekers and two

to CSFB. PC Connection did not receive a reply to any of its three letters. Patricia Gallup, CEO of PC Connection, wrote in a September 8, 2003 letter to CSFB that PC Connection had reviewed the press release issued that morning announcing the CDW Transaction, and believed it was "in a position to immediately proceed with the negotiation of an acquisition of those same assets for a purchase price significantly in excess of the price reported."

81.    Furthermore, CDW itself valued the Micro Warehouse business at significantly more than the purchase price. CDW performed its own discounted cash flow valuation of the assets and business it planned to acquire from Micro Warehouse. In this analysis, CDW's Vice President for Business Development, Anne Ireland, concluded that the present value of Micro Warehouse's U.S. operations was $    REDACTED    . Exhibit B, at 9 (to be filed under seal). This analysis was then used to support CDW management's recommendation to the CDW board that it proceed with the Micro Warehouse transaction.

82.    The investing public and contemporaneous reports issued by professional financial analysts further support the conclusion that the CDW Transaction was not in the best interest of the Company, its shareholders and its creditors.

83.    The investing public valued the Transferred Assets significantly greater than the $30 million consideration approved by Defendants, as evidenced by the fact that CDW's stock price jumped by $6.03, or 11.8 percent, on September 8, 2003, the date the sale was announced. Accordingly, CDW's market capitalization increased approximately $500 million that day.

84.    Contemporaneously published stock analyses also considered the transaction highly favorable to CDW. William Blair & Company described the purchase price as "meager" and wrote: "We think that, all in, the company is buying revenue at perhaps 2% of

sales, extraordinarily low even for a low-margin business like IT direct marketing. Clearly, Micro Warehouse is negotiating from a position of weakness...." Exhibit C, p. 1.

85.     On September 8, 2003, Morningstar wrote that "CDW's acquisition of the North American assets of privately held Micro Warehouse looks like a good deal," and noted that "CDW says Micro Warehouse's annualized North American revenue . . . is about $900 million. Given CDW's 4% net margins, the $22 million it paid for the assets, and the $10-$12 million it expects to take in charges, CDW should recoup its investment in less than a year even if it captures only $700 - $800 million of that annual revenue." Exhibit D, p. 1. (The $22 million price referenced in this report does not include the $8 million put option on the Ohio facility.)

86.     In a December 2003 report, Baird / U.S. Equity Research projected CDW's earnings per share to be $2.52, of which it attributed $0.15 of earnings per share to Micro Warehouse. Exhibit E, p. 2. With approximately 83 million CDW shares outstanding, Baird's analysis allocated $12.45 million in earnings to Micro Warehouse; CDW's existing P/E trading multiple of 26x thus produced an implied valuation of approximately $324 million.

87.     The subsequent performance of the Transferred Assets also confirms the Liquidating Trust's conclusion that Defendants accepted an unreasonably low price for the Transferred Assets. Specifically, a Morgan Stanley equity research analysis of CDW (dated July 20, 2004) showed that the incremental revenue generated by the Micro Warehouse assets acquired by CDW was $213 million in 2003 (between the closing of the CDW Transaction on Sept. 9, 2003 and Dec. 31, 2003), $340 million in the first half of 2004, and an estimated additional $127 million in the third quarter of 2004. Exhibit F, p. 8. The purchase price of $30

million pales in comparison to the revenue CDW generated by obtaining the Transferred Assets at less than reasonably equivalent value.

88.     Furthermore, CDW's sales in the first quarter of 2004 increased 31.4% over the same period in 2003, setting a new record for first-quarter sales. CDW's Chief Financial Officer, Barbara Klein, noted on an April 15, 2004 earnings call that the record-setting sales quarter "include[s] the impact of sales made by account managers who joined CDW in September 2003 as a result of the MicroWarehouse transaction." Exhibit G, p. 5.

89.     The fact that Defendants accepted an unreasonably low price for the Transferred Assets is also underscored by the fact that the Debtors sold the European businesses several months into the bankruptcy for net proceeds of $79.1 million. The European sale, in contrast to the CDW Transaction, was done under the supervision of the Bankruptcy Court in an orderly process.

**Defendants Fraudulently Concealed Their Breaches of the Fiduciary Duties of Loyalty, Care and Good Faith**

90.     Throughout 2003, the D&O Defendants fraudulently concealed their breaches of the fiduciary duties of loyalty, care and good faith. They did not inform Micro Warehouse, its shareholders and its creditors that they were not exploring the potential "M&A Alternatives" that had been identified at the October 29, 2002 Shareholder Meeting. (Para. 24, *supra*.)

91.     Furthermore, from July through early September 2003, Defendant York made a series of misrepresentations to creditors in which he failed to disclose material facts and engaged in conduct that led creditors reasonably to believe that there was no imminent liquidity or financial crisis facing Micro Warehouse, that Micro Warehouse would continue for the foreseeable future to be able to pay creditors on their trade financing of Micro Warehouse

purchases, and that Micro Warehouse would pay for specific purchases. These representations and associated conduct were false or misleading.

92.     For example, on July 14, 2003, Defendant York provided creditor Ingram Micro with a written report concerning Micro Warehouse's financial condition and business prospects. The report described Micro Warehouse's business, including both positive and negative developments. However, in the summary, Micro Warehouse wrote that "[d]espite the significant U.S. losses in the first half of this year, the combination of sales and gross profit momentum, coupled with very substantial expense reductions, will result in strong profitability and cash flow in the second half of the year." Defendant York participated in the preparation of this report. On information and belief, Defendant York knew and/or should have known that the summary's conclusion was false and misleading.

93.     Additionally, during a meeting held at Micro Warehouse's Connecticut headquarters on or about August 7, 2003, a Micro Warehouse accounts-payable manager stated to Ingram Micro's Keith Bradley and Robert Carbrey that another supplier to Micro Warehouse, Tech Data, was significantly reducing its credit support for sales to Micro Warehouse. Later that same day, the Ingram Micro representatives asked Defendant York if Tech Data had reduced its credit support, and Defendant York denied that this was taking place. Ingram Micro reasonably relied on these representations. In actuality, by July 1, 2003 Tech Data had substantially reduced the credit line directly extended to Micro Warehouse, and by late July 2003, Tech Data had terminated its $4 million guarantee of IBM floor financing (in addition to a prior reduction of Tech Data's own credit line). Defendant York knew or should have known that his contrary representation to Ingram Micro was false and misleading.

94.     Furthermore, by early August, the D&O Defendants did not inform creditors that they had decided they would need to engage in a major restructuring that would likely impair substantially, or destroy, Micro Warehouse's ability to pay its debts to trade creditors. They did not inform creditors that they had approved the retention of Alix Partners on August 5, 2003 as Crisis Managers of Micro Warehouse. Alix Partners is known for its work in preparing companies for bankruptcy and in managing them through the reorganization process. Neither the D&O Defendants nor anyone else at Micro Warehouse disclosed to creditors the fact that Alix Partners was being retained.

95.     As noted above, by August 19, 2003, Defendant Ramaekers had begun work on the Micro Warehouse assignment, and by August 22, 2003, he had determined to sell Micro Warehouse's North American assets. The D&O Defendants failed to inform creditors of these material facts.

96.     With respect to creditor Ingram Micro, the D&O Defendants continued their concealment of Micro Warehouse's true financial condition and their failure to act. The D&O Defendants led Ingram Micro to believe that they and Micro Warehouse were cooperating with Ingram Micro's credit-reduction initiatives, and moving toward a gradual reduction in Micro Warehouse's credit line. On August 22, 2003, the date that Defendant Ramaekers had determined to sell Micro Warehouse's North American assets, a conference call was held between Ingram Micro and Micro Warehouse personnel to coordinate the credit-reduction initiative. Defendant York participated in the call. No disclosure was made by the D&O Defendants – or anyone else – that Micro Warehouse was facing a liquidity and financial crisis, that Micro Warehouse had hired a Crisis Manager, and that decision-making authority had been transferred to Larry Ramaekers, or that Ingram Micro's further extensions of credit would not be

repaid. Instead, Defendant York discussed the details of various initiatives as if no major changes had occurred to Micro Warehouse or to its liquidity.

97.   By their representations and conduct, D&O Defendant York led Ingram Micro to believe that Micro Warehouse faced no liquidity crisis, would be continuing as a going concern, and was proceeding in the normal course of business.

98.   The fraudulent concealment continued on or about August 29, 2003, when D&O Defendant York told Ingram Micro's Vice-President, Keith Bradley, that Micro Warehouse was selling the "business or company to CDW." Defendant York said, "I assume you would rather have a $25 million credit line with CDW than with Micro Warehouse." This representation was reasonably interpreted by Mr. Bradley to mean that CDW would be assuming Micro Warehouse's liability to Ingram Micro, either through an acquisition of the stock of Micro Warehouse or otherwise, and that Ingram Micro would incur no loss as a result of any impending transaction. Defendant York knew and/or should have known that this representation was false and misleading.

99.   As alleged above, Micro Warehouse reached a "handshake" deal with CDW on September 2, 2003 (*see* para. 53, *supra*). But on September 3, 2003, Micro Warehouse participated in another conference call with Ingram Micro personnel to discuss the joint credit-reduction projects, including the consignment model. By proceeding with this conference call, Defendant York continued to cause Ingram Micro to believe that no imminent transaction was under way.

**Summary**

100.   The Liquidating Trust now brings this action to recover damages for Defendants' breaches of the fiduciary duties of loyalty, care and good faith that occurred as a

result of (a) the D&O Defendants failing to put the Transferred Assets up for sale earlier, before a liquidity crisis ensued; (b) the D&O Defendants' failing to hire a turnaround or restructuring advisor earlier in 2003, despite urgings from the Secured Lenders; (c) the D&O Defendants' abdicating all responsibility to Defendant Ramaekers, and then failing to supervise him; (d) the D&O Defendants' acquiescing in Defendant Ramaekers' decision to sell the Transferred Assets quickly, immediately before filing a chapter 11 petition, rather than in a court-supervised auction under Section 363 of the Bankruptcy Code; and (e) Defendant Ramaekers' conducting a massively deficient sale process.

101.    All of these acts and omissions culminated in the hasty consummation of an asset sale to CDW for grossly inadequate consideration.  The approval and closing of this transaction constituted further breaches of the duty of loyalty and the duty of care by Defendants, resulting in the Company, its shareholders and its creditors suffering damage.

## COUNT I
### (Breach of Fiduciary Duty of Loyalty and Lack of Good Faith Under Delaware Law By Defendants Boyer, Freeman, Johnson, Midler, Rullman, Sheik, Wilson and York)

102.    The Liquidating Trust repeats, realleges and incorporates each and every allegation contained in paragraphs 1 through 101 of this Complaint with the same force and effect as though fully set forth herein.

103.    By virtue of the D&O Defendants' positions, a fiduciary relationship existed between these defendants and the Company and its shareholders.  Additionally, as the Debtors were approaching the zone of insolvency, these defendants also owed fiduciary duties to the Debtors' creditors.

104.    As fiduciaries, the D&O Defendants were obligated by their duty of loyalty to act in a manner consistent with the best interests of the Company, its shareholders, and its creditors, and with the highest degree of good faith.

105.    The D&O Defendants breached their fiduciary duty of loyalty to the Company, its shareholders and its creditors by ignoring the financial "red flags" and repeatedly failing to act in light of circumstances that clearly required action.

106.    Specifically, the D&O Defendants (a) failed to put the Transferred Assets up for sale earlier, before a liquidity crisis ensued; (b) failed to hire a turnaround or restructuring advisor earlier in 2003, despite urgings from the Secured Lenders; and (c) abdicated crucial decision-making authority to Alix Partners' designee Lawrence Ramaekers, and then failed to adequately supervise him, which culminated in the Company receiving grossly inadequate consideration for the Transferred Assets.

107.    Furthermore, the D&O Defendants acquiesced in Defendant Ramaekers' decision to sell the Transferred Assets in a rushed and uninformed manner that resulted in the Company's receiving grossly inadequate consideration for the Transferred Assets.

108.    These acts and omissions were not in good faith.

109.    Plaintiff has been harmed as a result of these breaches of duty, because the Company was paid grossly inadequate consideration for the assets that were hurriedly sold to CDW, at a time when the Company was insolvent.

## COUNT II

### (Breach of Fiduciary Duty of Care and Lack of Good Faith Under Delaware Law By Defendants Boyer, Freeman, Johnson, Midler, Rullman, Sheik, Wilson and York)

110.    The Liquidating Trust repeats, realleges and incorporates each and every allegation contained in paragraphs 1 through 109 of this Complaint with the same force and effect as though fully set forth herein.

111.    By virtue of the D&O Defendants' positions, a fiduciary relationship existed between these defendants and the Company and its shareholders. Additionally, as the Debtors were approaching the zone of insolvency, these defendants also owed fiduciary duties to the Debtors' creditors.

112.    As fiduciaries, these defendants were obligated by their duty of care to act at all times on an informed basis, using the amount of care that a reasonable person would use under similar circumstances. Defendants also were obligated to act with the highest degree of good faith.

113.    The D&O Defendants breached their fiduciary duty of care and acted with gross negligence and without good faith, when they (a) failed to put the Transferred Assets up for sale earlier, before a liquidity crisis ensued; (b) failed to hire a turnaround or restructuring advisor earlier in 2003, despite urgings from the Secured Lenders; and (c) abdicated crucial decision-making authority to Alix Partners' designee Lawrence Ramaekers, and then failed to adequately supervise him, which culminated in the Company receiving grossly inadequate consideration for the Transferred Assets.

114.    Furthermore, the D&O Defendants acquiesced in Defendant Ramaekers' decision to sell the Transferred Assets in a rushed and uninformed manner that resulted in the Company's receiving grossly inadequate consideration for the Transferred Assets.

115. These acts and omissions were not in good faith.

116. Plaintiff has been harmed as a result of these breaches of duty, because the Company was paid grossly inadequate consideration for the assets that were hurriedly sold to CDW, at a time when the Company was insolvent.

## COUNT III
### (Breach of Fiduciary Duty of Care and Lack of Good Faith Under Delaware Law By Defendants Boyer, Rullman, Wilson and York To the Extent They Served As Officers Only)

117. The Liquidating Trust repeats, realleges and incorporates each and every allegation contained in paragraphs 1 through 116 of this Complaint with the same force and effect as though fully set forth herein.

118. Defendants Boyer, Rullman, Wilson, and York were officers of the Company until they resigned as such on September 5, 2003. By virtue of their positions as officers, a fiduciary relationship existed between them and the Company and its shareholders. Additionally, as the Debtors were approaching the zone of insolvency, these defendants also owed fiduciary duties to the Debtors' creditors.

119. As officers, Defendants Boyer, Rullman, Wilson, and York were obligated by their fiduciary duty of care to act at all times on an informed basis, using the amount of care that a reasonable person would use under similar circumstances. Defendants Boyer, Rullman, Wilson, and York also were obligated to act with the highest degree of good faith.

120. Defendants Boyer, Rullman, Wilson and York breached their fiduciary duty of care and acted with gross negligence and without good faith when they (a) failed to put the Transferred Assets up for sale earlier, before a liquidity crisis ensued; (b) failed to hire a turnaround or restructuring advisor earlier in 2003, despite urgings from the Secured Lenders; and (c) abdicated crucial decision-making authority to Alix Partners' designee Lawrence

Ramaekers, and then failed to adequately supervise him, which culminated in the Company receiving grossly inadequate consideration for the Transferred Assets.

121.    Furthermore, Defendants Boyer, Rullman, Wilson and York acquiesced in Defendant Ramaekers' decision to sell off the Transferred Assets in a rushed and uninformed manner that resulted in the Company's receiving grossly inadequate consideration for the Transferred Assets.

122.    Defendants Boyer, Rullman, Wilson and York breached their fiduciary duty of care as officers by engaging in a sustained and systemic failure to exercise reasonable oversight over Defendant Ramaekers.

123.    These acts and omissions were not in good faith.

124.    Plaintiff has been harmed as a result of these breaches of duty, because the Company was paid grossly inadequate consideration for the assets that were hurriedly sold to CDW, at a time when the Company was insolvent.

## COUNT IV

### (Breach of Fiduciary Duty of Care and Lack of Good Faith Under Delaware Law By Defendant Midler To the Extent He Served As Officer Only)

125.    The Liquidating Trust repeats, realleges and incorporates each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as though fully set forth herein.

126.    By virtue of Defendant Midler's position as an officer of the Company, a fiduciary relationship existed between him and the Company and its shareholders. Additionally, as the Debtors were approaching the zone of insolvency, Defendant Midler also owed fiduciary duties to the Debtors' creditors.

127.    As noted above, Defendant Midler served as an officer of the Company during the times complained of herein, and until on or about September 6, 2003, he did not serve contemporaneously as a director.   From on or about September 6, 2003 through the CDW Transaction closing on September 9, 2003, Defendant Midler also served as a director, and continued to serve as an officer.

128.    As an officer, Defendant Midler was obligated by his fiduciary duty of care to act at all times on an informed basis, using the amount of care that a reasonable person would use under similar circumstances.   Defendant Midler was also obligated to act with the highest degree of good faith.

129.    Defendant Midler breached his fiduciary duty of care and acted with gross negligence and without good faith when he (a) failed to put the Transferred Assets up for sale earlier, before a liquidity crisis ensued; (b) failed to hire a turnaround or restructuring advisor earlier in 2003, despite urgings from the Secured Lenders; (c) abdicated crucial decision-making authority to Alix Partners' designee Lawrence Ramaekers, and then failed to adequately supervise him; and (d) acquiesced in Defendant Ramaekers' decision to sell the Transferred Assets in a rushed and uninformed manner, which culminated in the Company's receiving grossly inadequate consideration for the Transferred Assets.

130.    In addition, Defendant Midler breached his fiduciary duty of care by engaging in a sustained and systemic failure to exercise reasonable oversight over Defendant Ramakers.

131.    These acts and omissions were not in good faith.

132.   Plaintiff has been harmed as a result of these breaches of duty, because the Company was paid grossly inadequate consideration for the assets that were hurriedly sold to CDW, at a time when the Company was insolvent.

## COUNT V

### (Breach of Fiduciary Duties of Care, Loyalty and Lack of Good Faith Under Delaware Law By Defendant Ramaekers)

133.   The Liquidating Trust repeats, realleges and incorporates each and every allegation contained in paragraphs 1 through 132 of this Complaint with the same force and effect as though fully set forth herein.

134.   By virtue of Defendant Ramaekers' position as an officer of the Company, a fiduciary relationship existed between Defendant Ramaekers and the Company and its shareholders. Additionally, as the Debtors were approaching the zone of insolvency, Defendant Ramaekers owed fiduciary duties to the Debtors' creditors.

135.   As a fiduciary, Defendant Ramaekers was obligated by his duty of loyalty to act in a manner consistent with the Company and its shareholders' best interests, and with the highest degree of good faith.

136.   Defendant Ramaekers was also bound by his duty of care to act at all times on an informed basis, using the amount of care that a reasonable person would use under similar circumstances.

137.   By virtue of his unique experience with financially-distressed companies, Defendant Ramaekers was required to draw on that experience in making key business decisions and fulfilling his fiduciary duty of care. Defendant Ramaekers failed to do so, in violation of his fiduciary duty of care.

138.    Defendant Ramaekers breached his fiduciary duties of care and loyalty to the Company, its shareholders, and its creditors when he acted with gross negligence and in bad faith by: (a) conducting a flawed sale process, failing to consider all material information that was reasonably available to him, and (b) selling the Transferred Assets in a rushed and uninformed manner, resulting in the Company's receiving grossly inadequate consideration for the Transferred Assets.

139.    These acts and omissions were not in good faith.

140.    Plaintiff has been harmed as a result of Defendant Ramaekers' breaches of duty, because the Company was paid less than reasonably equivalent value for the assets that were hurriedly sold to CDW, at a time when the Company was insolvent.

## COUNT VI
### (Corporate Waste By All Defendants)

141.    The Liquidating Trust repeats, realleges and incorporates each and every allegation contained in paragraphs 1 through 140 of this Complaint with the same force and effect as though fully set forth herein.

142.    The Defendants, as members of Micro Warehouse's Board of Directors and/or officers of the Company, owed to Micro Warehouse, to Micro Warehouse's shareholders and to Micro Warehouse's creditors (once the Company approached the zone of insolvency), a duty to protect and prudently use Micro Warehouse's assets. The Defendants had a duty not to waste those assets by engaging in an exchange that is so one-sided that no business person of ordinary, sound judgment could conclude that the Company received adequate consideration.

143.    Defendants wasted the Company's assets by selling the Transferred Assets in a rushed and uninformed manner that resulted in the Company's receiving grossly inadequate consideration for the Transferred Assets.

144.   The sale of the Transferred Assets to CDW was so one-sided that no business person of ordinary, sound judgment could have concluded that the Company received adequate consideration.

145.   Plaintiff has been harmed as a result of the Defendants' waste of corporate assets because the Company was paid well below reasonably equivalent value for the assets that were hurriedly sold to CDW, at a time when the Company was insolvent.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment:

(1)      awarding Plaintiff judgment in an amount to be determined at trial;

(2)      awarding Plaintiff its attorneys' fees, costs and other expenses it incurred in this action; and

(3)      granting Plaintiff such other and further relief as the Court deems appropriate.

Dated:   Wilmington, Delaware
         December 11, 2007

Respectfully submitted,

**MORRIS NICHOLS ARSHT & TUNNELL LLP**

By: _____
William H. Sudell, Jr. (No. 0463)
Daniel B. Butz (No. 4227)
1201 Market Street
P.O. Box 1347
Wilmington Delaware  19899-1347
(302) 658-9200

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Michael S. Stamer (admitted pro hac vice)
Robert Alan Johnson (admitted pro hac vice)
Jamie L. Berger (admitted pro hac vice)
Brian T. Carney (admitted pro hac vice)
590 Madison Avenue
New York, New York  10022
(212) 872-1000

*Attorneys for Bridgeport Holdings Inc.*
*Liquidating Trust*

1332097